UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER DUNCAN,

               Plaintiff,

                  v.

COUNTY OF WAYNE, ET AL.,

               Defendants.

Case No. 19-12211

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
STEPHANIE DAWKINS DAVIS

_____/

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [18]**

Plaintiff, Peter Duncan, was employed by the Wayne County Sherriff's Office ("WCSO") from January 1998 until his termination on April 13, 2018. (Am. Compl. ¶ 11). On July 26, 2019, Plaintiff filed suit against Wayne County, the WCSO, and Wayne County Undersheriff Daniel Pfannes ("Defendants"), alleging that his termination had stemmed from a violation of 42 U.S.C. § 1983. (ECF No. 1). Plaintiff amended his complaint on December 11, 2019. (ECF No. 16).

Plaintiff, who in late 2017 was romantically involved with a felon, claims that he was fired because Defendants selectively enforced an unconstitutional policy that prohibited such relationships, in violation of freedom of association and equal protection. (Am. Compl. ¶¶ 70-80). Before the Court is Defendants' Renewed

1

Motion to Dismiss [18] pursuant to FED. R. CIV. P. 12(b)(6), filed on January 15, 2020. (ECF No. 18). For the reasons stated below, Defendants' Motion to Dismiss [18] will be **GRANTED**.

## FACTUAL BACKGROUND

In August 2017, Plaintiff became romantically involved with Pamela Fodal, a woman whom he knew to be a felon. (Am. Compl. ¶¶ 14, 43). Ms. Fodal, as it happens, is also the former sister-in-law of Defendant Pfannes; she and his brother-in-law divorced in 2012. (Am. Compl. ¶¶ 15-17). Prior to this divorce, Plaintiff was investigated for allegedly making unprofessional comments about Defendant Pfannes to Ms. Fodal. (Am. Compl. ¶¶ 18, 33). Plaintiff claims that Defendant Pfannes has harbored animosity towards him since those allegations in 2010. (Am. Compl. ¶¶ 18-19, 31, 38). The investigation that ultimately led to Plaintiff's termination began after Defendant Pfannes learned that Plaintiff was romantically involved with Ms. Fodal. (Am. Compl. ¶¶ 23, 24, 30, 32).

Plaintiff's romantic relationship with Ms. Fodal came to Defendant Pfannes's attention on December 24, 2017, after Ms. Fodal called Defendant Pfannes's home to coordinate plans with her children for a holiday dinner. (Am. Compl. ¶ 21). She made the call with a phone Plaintiff had purchased for her on his wireless plan, so the caller ID displayed his name. (Am. Compl. ¶ 22). Upon receiving the call, Defendant Pfannes called Capt. Alan Bulifant in the WCSO's Internal Affairs

division and reported that Plaintiff might be suffering from a "bout of depression" and "might be suicidal or homicidal." (Am. Compl. ¶ 24).

Capt. Bulifant thereafter called Plaintiff, who informed him that he was doing very well and was planning to propose to Ms. Fodal within the next day or so. (Am. Compl. ¶¶ 26-27). Though he initially denied calling Defendant Pfannes's home, Plaintiff called Capt. Bulifant back after speaking with Ms. Fodal to clarify that *she* had called Defendant Pfannes's home to speak with his wife. (Am. Compl. ¶¶ 28-29). When Capt. Bulifant called Defendant Pfannes back to set the record straight, Defendant Pfannes informed Capt. Bulifant that he would file a report upon his return to work after the holidays. (Am. Compl. ¶ 30).

On January 8, 2018, Defendant Pfannes provided a written statement to Benny Napoleon, the Wayne County Sherriff, entitled "Notification of Suspicious Circumstances." (Am. Compl. ¶ 32). This statement included background information on the previous investigation into Plaintiff's allegedly unprofessional comments to Ms. Fodal in 2010 as well as speculation that Plaintiff might be suffering from depression and that he might be suicidal or homicidal. (Am. Compl. ¶¶ 33-34). WSCO Deputy Chief Tony Guy provided Capt. Bulifant with a copy of Defendant Pfannes's statement and instructed Capt. Bulifant to investigate and document the relationship between Plaintiff and Ms. Fodal. (Am. Compl. ¶ 39). Capt. Bulifant, in turn, instructed Plaintiff to write a memorandum detailing his

relationship with Ms. Fodal and requesting permission to continue the relationship. (Am. Compl. ¶¶ 41-42). Plaintiff complied, and submitted a statement to Lt. Michael Brandon, his supervisor, on January 16, 2018. (Am. Compl. ¶ 43).

On February 15, 2018, Plaintiff received a memorandum from Sheriff Napoleon citing Standard of Conduct 5.80 of the WCSO's Policies and Procedures ("the Felon Rule"). (Am. Compl. ¶ 49). That rule provides:

> *Officers shall avoid regular or continuous associations or dealings with persons whom they know, or should know, are* racketeers, sexual offenders, gamblers, narcotics dealers, *felons*, persons under criminal investigation or indictment, or who have a reputation in the community for involvement in felonious or criminal behavior, except as necessary to the performance of official duties.

(Am. Compl. ¶ 50) (emphasis added). Sheriff Napoleon stated in the memo that he would not make an exception to the Felon Rule so that Plaintiff could continue his relationship. (Am. Compl. ¶¶ 51). Upon receiving this news, Plaintiff ended his relationship with Ms. Fodal. (Am. Compl. ¶ 53).

Nevertheless, on March 12, 2018, Plaintiff was recommended for an Administrative Review and Determination Hearing and charged with violating several of the WSCO's Policies and Procedures. (Am. Compl. ¶¶ 54-56). These included: "1.0 Code of Ethics; 2.0 Violation of Rules (99-3 Zero Tolerance Incidents); Contact with Felon; 5.10 Conduct; 5.80 Personal Associations; 5.110 Unsatisfactory Performances; 6.30 Personal Integrity; [and] 6.35 Personal Responsibilities." (Am. Compl. ¶ 56).  Following that hearing, which took place on

4

March 22, 2018, WCSO Deputy Chief Scott Gatti recommended that Plaintiff be terminated. (Am. Compl. ¶¶ 57-60). On April 12, 2018, Plaintiff was terminated for "Improper Conduct," "Unsatisfactory Performance," "Violation of Departmental Policies or Rules," and "Offensive Behavior." (Am. Compl. ¶ 60).

## LEGAL STANDARD

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) seeks to dismiss a complaint for failure to state a claim. "To survive a motion to dismiss, [Plaintiff] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "assume[s] the veracity of [Plaintiff's] well-pleaded factual allegations and determine[s] whether . . . [P]laintiff is entitled to legal relief as a matter of law." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ANALYSIS

### I. PRELIMINARY MATTER: PROPER DEFENDANTS

#### A. The Wayne County Sheriff's Office Should Be Dismissed

Defendants argue, and Plaintiff concedes, that the WCSO is not an entity subject to suit. (ECF No. 18, PageID.433). Defendants are correct. *See, e.g.*, *Rhodes*

*v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991). Accordingly, all claims against the WCSO will be dismissed.

### B. Undersheriff Daniel Pfannes Was Not Voluntarily Dismissed

Defendants also contend that Plaintiff has voluntarily dismissed his claim against Defendant Pfannes in his individual capacity since Plaintiff's Amended Complaint [16] only listed "WAYNE COUNTY, WAYNE COUNTY UNDERSHERIFF DANIEL PFANNES and WAYNE COUNTY SHERIFF'S DEPT." as defendants. (ECF No. 16). Defendants contrast this caption with the caption on Plaintiff's initial Complaint [1], which read "WAYNE COUNTY, a municipal Corporation, WAYNE COUNTY SHERIFF'S OFFICE, a Municipal Corporation and DANIEL PFANNES *in his official and individual capacities*." (ECF No. 1) (emphasis added).

While courts assume, as a general rule, that defendants are being sued in their official capacities absent some indication to the contrary, *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989), such an assumption is inappropriate here. In *Pelfrey v. Chambers*, the plaintiff failed to specify that the defendant officers were being sued in their individual capacities in his complaint, yet the Sixth Circuit nevertheless allowed him to proceed against the defendants in their individual capacities. 43 F.3d 1034, 1038 (6th Cir. 1995). The case was distinguishable from the general rule, the

court held, because the plaintiff had given sufficient notice to the defendants one month after filing his initial complaint. *Id.* The same principle applies here.

Plaintiff clarified fewer than two months after filing his Amended Complaint that he had no intention of dismissing any claim against Defendant Pfannes in his individual capacity. (ECF No. 20, PageID.740). This clarification, in combination with the fact that Plaintiff's initial complaint *did* list Defendant Pfannes in his individual capacity, is sufficient to have provided Defendant Pfannes with notice that he was being sued in his individual capacity. Moreover, a review of the Docket shows that Plaintiff, Defendants, and the Court have each oscillated in the way in which the case caption is styled. For example, in Defendants' attorneys' appearance prior to Plaintiff amending his complaint, Defendants themselves omitted the individual capacity distinction when they captioned the case "WAYNE COUNTY, WAYNE COUNTY UNDERSHERIFF DANIEL PFANNES and WAYNE COUNTY SHERIFFS' DEPT." (ECF No. 2; ECF No. 3).

In light of the variations in captioning by both parties since this suit was filed and Plaintiff's speedy clarification, Defendant Pfannes will not be dismissed in his individual capacity merely because of Plaintiff's imprecise language.

## II. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983

### A. Freedom of Association

Plaintiff alleges that he was discharged for engaging in constitutionally protected activity—namely, maintaining a romantic relationship with Pamela Fodal. (Am. Compl. ¶¶ 71-73). Plaintiff is correct that the Constitution protects the "choice[] to enter into and maintain certain intimate human relationships," *Roberts v. U.S. Jaycees*, 568 U.S. 609, 617 (1984), however, that protection is not limitless. Indeed, the Sixth Circuit permits government employers to impose certain restrictions on such relationships. *See Akers v. McGinnis*, 352 F.3d 1030, 1040 (6th Cir. 2003). Accordingly, as explained in more detail below, because Plaintiff was only restricted from associating with a small percentage of potential partners and because the restriction was a facially reasonable way to address corruption and conflicts of interest, Defendants did not infringe upon Plaintiff's right to intimate association.

### 1. Plaintiff's Relationship is Constitutionally Protected

The first question the Court must address is whether Plaintiff's non-marital relationship with Ms. Fodal is constitutionally protected. In other words, whether it vests a liberty interest sufficient to enable Plaintiff to invoke the Due Process Clause. It does.

"Freedom of association receives protection as a fundamental element of personal liberty" under the Fourteenth Amendment. *Roberts*, 568 U.S. at 618; *see Hartwell v. Houghton Lake Cmty. Schs.*, 755 F. App'x 474, 478 (6th Cir. 2018)

8

(clarifying that the freedom of intimate association is protected by the Fourteenth Amendment, not the First). The Sixth Circuit has emphasized that "both personal friendships and non-marital romantic relationships" can fall within the ambit of constitutional protection. *Anderson v. City of LaVergne*, 371 F.3d 879, 881-82 (6th Cir. 2004). Relationships are more likely to be protected, however, when "characterized by 'such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.'" *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 598 (6th Cir. 2013) (quoting *Roberts*, 468 U.S. at 620). Based on these indicators, the Court finds that Plaintiff has sufficiently pleaded a protected intimate relationship.

### 2.  The Felon Rule Survives Rational Basis Review

Having established that Plaintiff's intimate relationship with Ms. Fodal is entitled to Fourteenth Amendment protection, the Court now examines whether the Felon Rule withstands review. It does.

Courts in the Sixth Circuit "always apply a tier of scrutiny to intimate-association cases" like the one at issue here, where "legitimate governmental interests at least partially motivate a challenged government action." *See Hartwell*, 755 F. App'x at 477, 479 (citing *Montgomery v. Carr*, 101 F.3d 1117, 1128 (6th Cir. 1996)). Specifically, where the challenged government policy "directly or substantially interferes with the right to intimate association," heightened scrutiny

applies; where it does not, "rational basis review is proper." *Id.* at 480 (citing

*Montgomery*, 101 F.3d at 1124).

> "[D]irect and substantial" burdens on intimate associations [exist] "only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations]."

*Anderson*, 371 F.3d at 882 (final three alterations in original) (quoting *Akers*, 352

F.3d at 1040).

In *Akers*, the Sixth Circuit considered a Michigan Department of Corrections

("MDOC") rule that forbid "improper or overly familiar conduct with [offenders or

their family members or visitors." 352 F.3d at 1034. The *Akers* court noted that the

rule "d[id] not prevent a large portion of MDOC employees from forming intimate

associations" in general, and that "all MDOC employees continue[d] to enjoy the

ability to form intimate associations—just not with offenders[, their relatives, or

their visitors]." *Id.* at 1040. It thus found that the MDOC rule was subject only to

rational basis review. *Id.*

The Felon Rule, like the rule in *Akers*, restricts employees from intimately

associating with only a small percentage of the jurisdiction's population—

approximately eight percent. *See* Sarah K.S. Shannon et al., *The Growth, Scope, and*

10

*Spatial Distribution of People with Felony Records in the United States, 1948–2010*,

54 DEMOGRAPHY 1795 (2017).

> This is far from the absolute bar against marrying a majority of the jurisdiction's population said in *Loving* [*v. Virginia*, 388 U.S. 1 (1967)] to be a direct and substantial interference. Moreover, while the bar in *Loving* was absolute, the simple expedient of transferring to another part of the state government or taking employment in the private sector is available to . . . employees here.

*Akers*, 352 F.3d at 1040-41. Accordingly, rational basis review is proper, and the Felon Rule must be upheld so long as it is "a reasonable means to advance a legitimate governmental interest." *Hartwell*, 755 F. App'x at 480 (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 712 (6th Cir. 2001)).

To support the Felon Rule's rationality, Defendants offer the following description of the governmental interests it advances:

> [A] shadow of disrepute [is cast] on the officer as well as the Office when law enforcement are seen socializing with criminals. Further, personal relationships with felons and criminal elements can create conflicts of interest for sworn officers, as well as provide avenues for corruption and temptation for those in whom the public places its trust.

(ECF No. 18, PageID.442). It is plain from this explanation that Defendants make no distinction between individuals presently associated with criminal activity and people, like Ms. Fodal, for whom criminality is a thing of the past. In other words, the Felon Rule rests upon the discredited foundation that "once a criminal, always a criminal." This antiquated premise not only runs contrary to the bulk of

contemporary thinking on recidivism and reentry,[1] but cuts against the spirit of recent second-chance legislation in Michigan and other jurisdictions around the country.[2]

On its face, "[t]he regulation prohibits . . . officer[s] from associating with a neighbor, fellow church members, etc., arrested once decades ago." *Sponick v. Detroit Police Dep't*, 49 Mich. App. 162, 179 (1973). It even "prohibits . . . officer[s] from befriending a recently convicted individual and helping him become a productive citizen." *Id.* The Court is highly skeptical that such a policy is an effective means of achieving Defendants' goals. *See id.* (finding that a similar rule could "have no possible bearing on the integrity of a police officer or that of his department and

---

[1] JOHN G. MALCOLM & JOHN-MICHAEL SEIBLER, THE HERITAGE FOUND., COLLATERAL CONSEQUENCES: PROTECTING PUBLIC SAFETY OR ENCOURAGING RECIDIVISM? 2, https://www.heritage.org/sites/default/files/2017-03/LM-200.pdf [https://perma.cc/G782-7SBN] ("It is not in anyone's best interests to consign ex-offenders to a permanent second-class status. Doing so will only lead to wasted lives, ruined families, and more crime."); AM. BAR. ASS'N, STANDARDS FOR CRIMINAL JUSTICE, COLLATERAL SANCTION AND DISCRETIONARY DISQUALIFICATION OF CONVICTED PERSONS § 19-2.6(c) (3d ed. 2004), https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_arch ive/crimjust_standards_collateral_blk/#2.6 [https://perma.cc/E6LW-HQE2] (advocating against collateral consequences that involve "deprivation of legally recognized domestic relationships and rights").

[2] *See* Press Release, Gretchen Whitmer, Governor, State of Michigan, Governor Whitmer Signs Bipartisan "Clean Slate" Criminal Justice Reform Bills Expanding Opportunities for Expungement, Breaking Barriers to Employment and Housing Opportunities (Oct. 12, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499-542110--,00.html [https://perma.cc/RJ95-K62Y]; *see also, e.g.*, Faith Karimi, *Pennsylvania is Sealing 30 Million Criminal Records as Part of Clean Slate Law*, CNN (June 28, 2019), https://www.cnn.com/2019/06/28/us/pennsylvania-clean-slate-law-trnd/index.html [https://perma.cc/59EC-LCTK]. *See generally* U.S. COMMISSION ON C.R., COLLATERAL CONSEQUENCES: THE CROSSROADS OF PUNISHMENT, REDEMPTION, AND THE EFFECTS ON COMMUNITIES 4-5 (2019), https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf [https://perma.cc/R5BG-LNXM].

no possible bearing on the public's confidence in the police"). Nevertheless, the Felon Rule need not be "the best [means] for achieving [the government's] stated ends," so long as it is "rational in view of those ends." *Id.* (quoting *Montgomery*, 101 F.3d at 1130). In light of the Sixth Circuit's decision in *Akers*, which found the similarly broad MDOC rule to be rational, *see* 352 F.3d at 1039, there is little question that the Felon Rule also satisfies this very low bar.

It is high time for the Sixth Circuit to reevaluate the reasonableness of policies like the Felon Rule, especially as applied to individuals who are no longer on probation or parole. At present, however, this Court has no choice but to find the Felon Rule constitutional.

### B. Plaintiff's Equal Protection Claim Should Be Dismissed

Plaintiff next alleges that Defendants selectively enforced the Felon Rule against him based on animosity and a malicious intent to punish. (Am. Compl. ¶¶ 76-80). He argues that his relationship with Ms. Fodal was subject to harsher treatment than the relationships of other WSCO officers who associated with felons. (*Id.*). Plaintiff supports his argument by citing four similarly situated employees of the WSCO who were not disciplined for their personal or romantic associations with felons. (Am. Compl. ¶¶ 65-69).

At bottom, Plaintiff here is alleging a "class-of-one" equal protection theory. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "In a class-of-one

claim, a 'plaintiff alleges that [they] ha[ve] been intentionally treated differently from others similarly situated,' and that either 'the government actors had no rational basis for the difference' or the 'challenged government action was motivated by animus or ill-will.'" *Bartlett v. Washington*, 793 F. App'x 403, 407 (6th Cir. 2019) (citations omitted) (first quoting *Olech*, 528 U.S. at 564; then quoting *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015)). Plaintiff tries to plead around the class-of-one framework, which, as described below, is unavailable in the public employment context, by complaining of "selective enforcement and selective treatment." (Am. Compl. ¶ 79); *see infra* section II.B.2. This attempt, however, is ultimately unavailing. *See Bartlett*, 793 F. App'x at 407-08 (noting that "[plaintiff] essentially pleads and describes a class-of-one claim while insisting that it is something else" and finding the claim barred under a class-of-one framework).

### 1. Analysis as to All Defendants

Defendants first argue, citing *Futernick v. Sumpter Twp.*, 78 F.3d 1051 (6th Cir. 1996), that Plaintiff's claim fails because Plaintiff has not pled membership in a protected class. (ECF No. 18, PageID.446). Defendants are correct that Plaintiff has not pled membership in a protected class, however, that is irrelevant for the purposes of a class-of-one claim. *See Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004) (explaining that *Futernick* was "completely undercut" by *Olech*'s recognition of the class-of-one theory).

Defendants next argue, citing *Lipkovitch v. County of Wayne*, No. 10-13961-DT, 2012 U.S. Dist. LEXIS 141354, at *21 (E.D. Mich. Sep. 30, 2012), that selective enforcement claims require criminal prosecution, and that no such prosecution occurred here. (ECF No. 18, PageID.444-45). This argument is unpersuasive for two reasons. First, *Lipkovitch* appears to misstate the law. The Sixth Circuit decision on which it relied actually said that "*[u]sually*, claims of selective enforcement arise as a defense in criminal prosecutions." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis added). Second, *Gardenshire*, which expanded upon *Futernick*, was decided prior to *Olech*, and does not accurately reflect the current class-of-one claim requirements. Accordingly, the absence of criminal prosecution does not preclude Plaintiff from bringing a class-of-one equal protection claim.

## 2. Analysis as to Defendant Wayne County

Defendants' final argument is that Plaintiff fails to state an equal protection claim because the class-of-one theory of equal protection is inappropriate in the context of public employment. (ECF No. 22, PageID.754). Defendants are correct.

In *Engquist v. Or. Dep't of Agric.*, the Supreme Court clarified that "the class-of-one theory . . . is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." 553 U.S. 591, 605 (2008).

The plaintiff in *Engquist* worked in a food lab at the Oregon Department of Agriculture. 553 U.S. at 594. After experiencing "repeated problems" with a co-worker who was ultimately promoted to a job for which they had both applied, the plaintiff was "effectively laid off." *Id.* at 594-95. She sued the Oregon Department of Agriculture ("ODA"), her co-worker-turned-manager, and the ODA's Assistant Director, alleging a class-of-one equal protection claim. *Id.* at 596. The District Court ruled "that [she] could succeed [under a class-of-one] theory if she could prove 'that she was singled out as a result of animosity on the part of [her former co-worker and the ODA's Assistant Director]' . . . and if she could demonstrate, on the basis of that animosity, that 'she was treated differently than others who were similarly situated.'" *Id.* at 595-96 (quoting *Engquist v. Or. Dep't of Agric.*, No. 02-1637-AS, 2004 U.S. Dist. LEXIS 18844, at *14 (D. Or. Sep. 14, 2004). After a jury found in the plaintiff's favor, the Ninth Circuit reversed, "hold[ing] that the class-of-one theory [was] 'inapplicable to decisions made by public employers with regard to their employees.'" *Id.* at 596 (quoting *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007)). The Supreme Court affirmed. *Id.* at 609.

The Sixth Circuit has interpreted and extended *Engquist* to bar equal protection claims by 1) a Michigan Department of Corrections Officer who was fired for violating departmental rules, *Bartlett*, 793 F. App'x at 408; 2) a college student who lost a basketball scholarship after performing less well than her teammates,

*Heike v. Guevara*, 519 F. App'x 911, 922 (6th Cir. 2013); and most recently, 3) a former Michigan House of Representatives member who claimed to have been victim to a political conspiracy, *Courser v. Allard*, No. 20-1038, 2020 U.S. App. LEXIS 25223, at *13 (6th Cir. Aug. 10, 2020).

Here, because the decision to terminate Plaintiff "by [its] nature involve[d] discretionary decisionmaking based on a vast array of subjective, individualized assessments," *Engquist*, 553 U.S. at 594, Plaintiff's class-of-one claim is similarly barred, "regardless of what he calls it." *Bartlett*, 793 F. App'x at 408.

### 3. Analysis as to Defendant Pfannes

Lastly, Plaintiff's "cat's paw" theory of liability against Defendant Pfannes is backwards. A cat's paw allegation charges that "*an employer* [should] be liable for 'employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision.'" *Isotalo v. Kelly Servs.*, No. 12-11253, 2013 U.S. Dist. LEXIS 157762, at *19 (E.D. Mich. Nov. 4, 2013) (emphasis added) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011). Defendant Pfannes is not Plaintiff's employer, but rather, a fellow employee. Accordingly, he is not the proper target of a cat's paw theory of liability. Moreover, even if Plaintiff had properly pleaded a cat's paw theory against his employer, Wayne County, and plausibly alleged that Defendant Pfanne's actions were

motivated by animus—neither of which he has done—Plaintiff's claim would still fail because of *Engquist*, as discussed above.

## III. STATE LAW CLAIMS UNDER ELCRA

Pursuant to 28 U.S.C. § 1367, the Court will not exercise supplemental jurisdiction over the remaining state law claim against Defendants and it will be dismissed without prejudice. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction.").

**CONCLUSION**

**IT IS ORDERED** that Defendants' Motion to Dismiss [18] is **GRANTED**. Plaintiff's federal claims under 42 U.S.C. § 1983 are **DISMISSED with prejudice**. Plaintiff's state law claim under ELCRA is **DISMISSED without prejudice**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow

Dated: October 26, 2020            Senior United States District Judge